**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC.,**<br>a Delaware Corporation,<br>P.O. Box 575777,<br>Salt Lake City, Utah 84157<br><br><br><br>                    Movant/Plaintiff,<br><br>v.<br><br>**ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES, D/B/A ACCREDITING COMMISSION OF CAREER SCHOOLS AND COLLEGES,**<br>a Virginia Corporation,<br>2101 Wilson Boulevard, Suite 302<br>Arlington, VA 22201<br><br>**Registered Agent**:<br>CT Corporation System<br>4701 Cox Rd., Ste. 285<br>Glen Allen, VA 23060<br><br>                    Respondent/Defendant. | Case No: 1:22-cv-1223<br><br>**MOTION TO VACATE ARBITRATION AWARD AND COMPLAINT**<br><br>Injunctive Relief Sought<br><br>Jury Trial Demanded |

## MOTION TO VACATE ARBITRATION AWARD AND COMPLAINT

Movant/Plaintiff, Center for Excellence in Higher Education ("CEHE"), by counsel, seeks an order vacating an August 4, 2022 arbitration award ("Award," Ex. A) entered by the arbitrator in favor of Respondent/Defendant, Accreditation Alliance of Career Schools and Colleges d/b/a Accrediting Commission of Career Schools and Colleges ("ACCSC"). CEHE also brings this civil action against ACCSC seeking declaratory relief, injunctive relief, and damages, alleging as follows:

**Introduction**

1. CEHE brings this action to vacate the Award because the enforcement of that Award would sanction ACCSC's failure to afford CEHE due process and fundamental fairness required under federal law. Additionally, or in the alternative, CEHE brings claims to remedy ACCSC's due process failures and tortious interference with CEHE's contracts and business expectations. Withdrawing accreditation is a death sentence for institutions of higher education. ACCSC's unlawful acts caused CEHE to lose access to critical Title IV funding, to lose the ability to continue enrolling then-current and future students, and ultimately led to the closure of CEHE's schools.

2. The extreme consequences of a withdrawal decision elevate ACCSC's duty to afford due process to CEHE. But ACCSC denied CEHE a fair opportunity to appeal the decision to withdraw accreditation from Independence University ("IU," an institution owned by CEHE), as required by federal law. Instead, ACCSC manipulated its internal appeals process and arbitration rules to shield the arbitrator from considering material evidence of bad faith and disparate treatment.  Because ACCSC imposed rules that barred the arbitrator from hearing evidence material to CEHE's claims, this Court must vacate the award under the Federal Arbitration Act, 9 USC 10(a)(3). Additionally, or in the alternative, this Court must remedy ACCSC's deprivation of CEHE's due process rights and its knowing and deliberate acts to close CEHE by preventing CEHE from enrolling students and accessing Title IV funding.

3. The evidence of disparate treatment and pretext is compelling. Yet ACCSC precluded both its own internal Appeals Panel and, later, the arbitrator from meaningfully considering whether CEHE received the due process and fundamental fairness required by federal law. *See Prof'l Massage Training Ctr. v. Accreditation All. of Career Sch. & Colls.*, 781 F.3d 161, 169 (4th Cir. 2015).  Prior to the withdrawal decision, ACCSC frequently acknowledged and commended

CEHE's efforts towards resolving the compliance issues forming the basis of the decision, and in July 2020, it expressly found that CEHE had shown good cause to continue demonstrating the success of those efforts.  In CEHE's next submission to ACCSC, it provided verifiable data showing the unequivocal success of CEHE's newly implemented initiatives. But ACCSC nonetheless prematurely and without a rational basis revoked its good cause finding and suddenly withdrew IU's accreditation.

4. The timing and nature of ACCSC's unexplained shift in position indicated that the decision was pretext aimed at self-preservation rather than a fair and uniform application of ACCSC's *Standards of Accreditation* ("*Standards*"). Indeed, publicly available information revealed several instances in which ACCSC continued an institution's accreditation notwithstanding its similar, or even worse, history of compliance with the same *Standards* at issue with respect to IU.

5. Upon information and belief, ACCSC's disparate treatment of CEHE was triggered by an August 21, 2020 Colorado state court ruling against CEHE, which was based on marketing and enrollment practices that ACCSC itself had contemporaneously reviewed and approved.  Upon appeal to the Colorado Court of Appeals, the decision was later determined to be erroneous and was reversed. But at the time of the initial ruling—just one month after ACCSC's good cause determination—it was deeply embarrassing to ACCSC. That is because ACCSC's own application for continued federal recognition was up for review by the Department of Education in a matter of mere months. In an attempt to deflect scrutiny and damaging criticism in the wake of the Colorado ruling, ACCSC, to defend itself, precipitously and prematurely withdrew IU's accreditation.

6. Throughout both ACCSC's internal appeals procedures and subsequent arbitration requirements, CEHE sought to introduce evidence of ACCSC's disparate treatment and bad faith motivations for taking the extreme ultimate sanction against CEHE and its schools. However, ACCSC's Executive Director, Dr. Michale McComis, arbitrarily denied CEHE's reasonable request for crucial records. ACCSC's Appeals Panel was thus denied substantive and vital facts in considering the propriety of the withdrawal decision. When CEHE sought review of the Appeals Panel's decision through arbitration, ACCSC cited its self-promulgated *Instructions for Arbitration* ("*Instructions*"), which precluded the arbitrator from considering any evidence not before the Appeals Panel.  Thus, according to ACCSC's procedures, the unilateral decision of a single ACCSC executive, Dr. McComis, to withhold relevant evidence was unreviewable. That is not the law, and the Award must be vacated and remanded for consideration of the material evidence unlawfully withheld from the arbitrator.

## Parties

7. Petitioner CEHE is a tax-exempt nonprofit corporation under section 501(c)(3) of the Internal Revenue Code. The corporation exists and operates pursuant to the laws of Delaware. Its principal place of business is in Salt Lake City, Utah.

8. CEHE owned four institutions of higher education: Stevens-Henager College ("SHC"), d/b/a Independence University, CollegeAmerica Denver, CollegeAmerica Arizona, and California College San Diego. Each institution operated multiple campuses. At the time of the withdrawal, CEHE was only enrolling students at its online institution, IU, and was teaching out its remaining students at the other institutions.  At the time of the withdrawal decision, CEHE enrolled almost 10,000 students and had approximately 1,500 employees.

9. Respondent ACCSC is a Virginia corporation with its principal place of business in Arlington, Virginia. ACCSC is an accrediting agency officially recognized by the Department of Education ("Department"), pursuant to 20 USC 1099b and 34 CFR part 602.

**Jurisdiction and Venue**

10. This Court has subject matter jurisdiction pursuant to 28 USC 1331, 28 USC 1332(a)(1) and 20 USC 1099b(f).

11. This Court has federal question jurisdiction under 28 USC 1331 because the matters presented in this Petition to Vacate and civil action arise under the Constitution, laws, or treaties of the United States and presents questions about whether ACCSC violated CEHE's federal due process rights in the accreditation process.

12. This Court has diversity jurisdiction under 28 USC 1332(a)(1) because CEHE and ACCSC are citizens of different states.  CEHE is incorporated in Delaware and has its principal place of business in Utah. ACCSC is incorporated and has its principal place of business in Virginia. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13. This Court has jurisdiction under 20 USC 1099b(f), which provides: "Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association recognized by the Secretary [of the Department of Education] for the purposes of this subchapter and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in an appropriate United States district court."

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

**Factual Allegations**

**a.   ACCSC's obligation under federal law to provide due process.**

15. In order to participate in federal student assistance programs authorized under Title IV of the Higher Education Act ("HEA"), an institution must be accredited by a federally recognized accrediting agency, like ACCSC. *See* 20 USC 102. The vast majority of higher education students in the United States use Title IV funds, at least in part, to fund their education. Title IV funds are the lifeblood of nearly every American college and university.

16. Recognizing the quasi-governmental role accreditors fill in determining eligibility to participate in federal programs, courts have held that accreditors are obligated under federal common law to provide due process to the schools they accredit.  *Prof'l Massage.*, 781 F.3d at 169 (4th Cir. 2015).  "They, like all other bureaucratic entities, can run off the rails."  *Id.* "[A]creditors wield enormous power over institutions—life and death power, some might say— which argues against allowing such agencies free rein to pursue personal agendas or go off on some ideological toot." *Id.* at 170.

17. Thus, accreditors are required to adhere to administrative law principles and fundamental notions of fairness. *Id.* at 180-71. Such fairness requires, among other things, that similarly situated institutions be treated similarly by the accreditor. *Med. Inst. of Minn. v. Nat'l Assoc. of Trade & Tech. Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987). And when an accreditor departs from past precedent or practices, it must provide a reasoned explanation for doing so. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

18. In addition to these basic common-law requirements, the HEA and Department further inform the due process accreditors must provide in the accreditation process. *See* 34 CFR 602.25

(describing additional due process requirements); *Bristol Univ. v. Accrediting Council for Indep. Colls. & Schs.*, 691 F. App'x 737, 741 (4th Cir. 2017).

19. For example, the Department expressly requires an accreditor to "consistently apply and enforce [its] standards," 34 CFR 668.18(a), and have "effective controls against the inconsistent application of [those] standards." 34 CFR 668.18(b)(2). The Department further specifies that accreditation decisions must be based on published standards, rather than political agendas. 34 CFR 668.18(b)(3).

20. The HEA also requires that institutions of higher education must submit any dispute involving the final withdrawal of accreditation to initial arbitration prior to any other legal actions.  20 USC 1099b(e). However, nothing in the HEA or the Department's regulations authorizes accreditors to limit the scope of the arbitrator's review to preclude consideration of evidence related to the accreditor's compliance with federal due process requirements.

**b. ACCSC's Appeal and Arbitration procedures fail to provide sufficient due process.**

21. When ACCSC withdraws an institution's accreditation, the only avenue for appeal is through ACCSC's internal appeal process as detailed in Section VIII of the ACCSC *Rules of Process and Procedure* ("*Rules*"). *See* Ex. B at 11-15 (Excerpts from *ACCSC's Rules of Process and Procedure* and *Standards of Accreditation*).[1]

22. Pursuant to those procedures, an institution can appeal a withdrawal decision if it has reason to believe that ACCSC's decision was "arbitrary, capricious, or in substantial disregard of

---

[1] A full version of ACCSC's *Standards of Accreditation* (which contains the *Rules* and ACCSC Bylaws) is available on ACCSC's website: https://www.accsc.org/UploadedDocuments/1967/ACCSC-Standards-of-Accreditation-and-Bylaws-070118.pdf

the criteria or procedures of the Commission, or not supported by evidence in the record on which the Commission took action." *Rules*, VIII.B.1 (Ex. B at 11).

23. The institution submits its appeal to a three-person Appeals Panel. *Rules*, VIII.D (Ex. B at 13).  In considering the institution's Grounds for Appeal (which is the institution's written submission) and hearing arguments, the Appeals Panel may only consider the information that was before ACCSC at the time of the initial withdrawal decision. *Rules*, VIII.B.4 (Ex. B at 11).

24. But institutions have no way of knowing what information was actually before ACCSC when it acted to withdraw accreditation, other than the specific correspondence and submissions between the two parties. Moreover, the *Rules* do not provide any mechanism for institutions to seek supplementation of the record to ensure that the Appeals Panel has all relevant and material information before it when reviewing ACCSC's initial decision.

25. If the Appeals Panel affirms the initial decision, the institution's only recourse is binding arbitration, subject to ACCSC's *Instructions for Arbitration*, which preclude the arbitrator from considering any materials not included in the record before the Appeals Panel. Ex. C at 1 ("*Instructions*," Section I.B.2). Moreover, the arbitrator's review is further limited to consideration only of whether, based solely on ACCSC's curated record, the Appeals Panel's decision was supported by substantial evidence. *Instructions*, Section I.B.1 (Ex. C at 1). The instructions also expressly prohibit any discovery that might allow affected institutions the opportunity to identify material evidence withheld by ACCSC in the proceedings below. *Instructions*, Section I.E (Ex. C at 3). Put another way, ACCSC has unfettered discretion to set the record in however manner it sees fit, without any opportunity for subsequent review of that decision.

26. The proceedings in the instant matter are instructive on that point. At the outset of the arbitration proceedings, CEHE filed a Motion to Supplement the Arbitration Exhibits, seeking an order from the arbitrator requiring ACCSC to produce documentation evidencing its treatment of similarly situated institutions with similar compliance issues. However, the arbitrator confirmed that he was "constrained by the [Instructions] to decline [CEHE's] requests that the Commission be ordered to produce documents that were not in the record before the Appeals Panel or that discovery be permitted in arbitration." Ex. D at 7-8 (Arbitrator's Ruling Concerning Arbitration Exhibits). Thus, ACCSC's exclusion of material evidence has never received any meaningful independent review.

### c. ACCSC arbitrarily and capriciously withdrew IU's accreditation and withheld material evidence from consideration by the arbitrator.

#### i. *ACCSC's student achievement Standards.*

27. ACCSC's purported basis for its withdrawal decision was that several online IU programs reported graduation and employment rates that fell below ACCSC requirements. However, communications between the parties leading up to the decision show that ACCSC recognized that CEHE had already addressed those findings though an approved corrective action plan. CEHE had demonstrated, through verifiable data, that IU's then-currently enrolled online students tracked to graduate and find employment at acceptable rates.

28. The *Standards* require member institutions to demonstrate that their students graduate and obtain in-field employment at acceptable rates set by the Commission, known as "benchmark" rates. *Standards*, VII.B.1.b (Ex. B at 18-19). When a group of students start an enrollment period for a given program, that group is known as a cohort. ACCSC requires institutions to submit an annual report with graduation and employment rates for each cohort for each program offered. *Standards*, Appendix VI (Ex. B at 21). If an institution fails to

demonstrate that a cohort graduated and found employment at benchmark rates, then it will be deemed out of compliance with student achievement *Standards*. *Id.*

29. When a member school is found to be out of compliance with student achievement *Standards*, ACCSC can initiate adverse action, which may include placing the school on warning or probation status or withdrawing accreditation. *Standards*, VII.B.2.c (Ex. B at 20).

30. ACCSC allows an institution a maximum of three years to remedy noncompliance with any *Standard*, unless good cause exists to extend the time frame. *Rules*, Section VII.M.1 (Ex. B at 9). The *Rules* state that a "school **will be deemed** to have demonstrated good cause if it has shown . . . significant progress has been made toward achieving compliance . . . and when extenuating circumstances exist such that only through the provision of additional time can the school demonstrate compliance." *Rules*, Section VII.M.2 (Ex. B at 9-10) (emphasis added). ACCSC's good cause standard is vital with respect to student achievement *Standards* because new cohorts often do not become reportable for much longer than three years after enrollment.

31. Here, both ACCSC and CEHE understood that it would take more than three years for IU to meet benchmark rates in its annual reports. That is because IU offered primarily 20- to 36-month degree programs. Ex. A at 14-15. A cohort does not become reportable until one-and-a-half times the length of the program. *Id.* at 16-17. Thus, if a cohort started today, IU would not know if that cohort graduated at benchmark rates for 30 to 54 months, depending on the program. *Id.* For reference, most ACCSC member schools offer short-term, in-person degree programs, which can be completed in a matter of months and are often reportable within a year. IU's programs were more substantial, consistent with traditional college programs.

*ii.   CEHE proved that IU successfully resolved its student achievement issues.*

32. In September 2018, ACCSC concluded that IU was out of compliance with student achievement *Standards* due to below-benchmark rates in various programs. The Commission placed IU (and other commonly owned schools) on probation. By that time, IU had already begun substantial efforts to identify the root causes of, and solutions for, its below-benchmark rates.

33. At that time, CEHE had decided to close all but one of its traditional ground-based schools to focus its efforts on IU and its online programs. Due to the lack of in-person interaction and social engagements, fully online programs tend to have significant difficulty retaining students through the completion of their programs. Leading online universities often report graduation rates that are substantially below ACCSC benchmarks. For example, Purdue University Global's eight-year graduation rate is 30%, Maryland Global Campus's is 28%, and Liberty University's is 34%.[2]

34. Nonetheless, CEHE and IU were committed to complying with student achievement *Standards*, notwithstanding the extreme difficulties created by online delivery of education.

35. CEHE devoted roughly $10 million to study and implement effective initiatives to improve student outcomes. Over its roughly two-year probationary period, CEHE consistently updated ACCSC about the status of those initiatives, and ACCSC consistently acknowledged and commended those efforts. In a July 21, 2020 Continued Probation letter—the last review of IU's efforts before ACCSC abruptly withdrew accreditation—ACCSC recognized the breadth of

---

[2] Purdue University Global (https://collegescorecard.ed.gov/school/?489779-Purdue-University-Global); Maryland Global Campus (https://collegescorecard.ed.gov/school/?163204-University-of-Maryland-Global-Campus); Liberty University (https://collegescorecard.ed.gov/school/?232557-Liberty-University).

CEHE's recently implemented initiatives to improve graduation rates and acknowledged that IU's distance education programs would not report benchmark graduation rates for several years. Ex. E at 15 (Arb. Ex. 6, July 21, 2021 Continued Probation Letter).[3] ACCSC found that, based on IU's demonstrated progress, good cause existed to continue IU's accreditation until at least May 2021. *Id.* at 31 ("In particular, the Commission recognized the length of time needed to demonstrate the school's ability to improve student achievement outcomes"). The Commission was clear that progress would be measured based on the success of the recently enrolled cohorts, who were the first to receive the benefits of IU's new initiatives—students who would not become reportable for 30 to 54 months. *Id.* at 15; Ex. F at 18-19 (Arb. Ex. 10, Oct. 28, 2019 Continued Probation Order) (confirming that IU's compliance would be determined based on "studies of academic progress, retention data and finally student graduation rates for the first cohorts of students admitted under the new process and procedures").

36. In its subsequent December 20, 2020 response, CEHE provided updated projections for IU's recently enrolled cohorts, which showed that IU's efforts had succeeded. Ex. G. (Excerpt from Arb. Ex. 5, December 20, 2020 Probation Response). The recently enrolled cohorts for all programs were on track to meet or exceed benchmark rates. *Id.* This was an outstanding achievement for an institution that offered 100% online programs.

> iii.   *Without explanation or justification, ACCSC reversed its position and immediately withdrew IU's accreditation.*

37. But at its February 2021 meeting, ACCSC prematurely withdrew IU's accreditation— even though it had given CEHE until May 2021 to demonstrate continued progress. Ex. H at 5-6

---

[3] Pursuant to ACCSC's Instructions for Arbitration, the arbitrator was limited to consideration of the record that was before the Arbitration Panel, which was referred to as "Arbitration Exhibits." *Instructions for Arbitration*, I.F. Where an exhibit cited in this Motion/Complaint was included as an Arbitration Exhibit, CEHE has identified the exhibit number used in the arbitration proceedings as Arb. Ex. [].

(Arb. Ex. 4, Apr. 22, 2021 Withdrawal Order). Had ACCSC allowed CEHE until May 2021 to show continued improvement (as previously promised), CEHE would have shown that most IU programs would have met benchmarks ahead of the projections set forth in the December 20, 2020 Response. Ex. I at 12-13 (Excerpts from Arb. Ex. 3, May 27, 2021 Grounds for Appeal). The precipitous withdrawal decision, which was published on April 22, 2021, was illogically based entirely on older cohorts, which ACCSC always knew would not, and could not, graduate at benchmark rates. That change in position blatantly contradicted ACCSC's prior acknowledgments that progress would be measured based on the most recently enrolled cohorts. ACCSC's premature decision prevented IU from further demonstrating progress as requested by ACCSC.

38. Given ACCSC's prior acknowledgement of the time it would take for IU's multi-year programs to report above-benchmark rates, the withdrawal decision is capricious. IU subsequently learned from limited, publicly available ACCSC accreditation decisions that other schools were permitted to remain accredited even though they failed to meet student achievement benchmarks in **all** of their programs. Moreover, those decisions noted the institutions' failures to demonstrate any ability to resolve the underlying issues. ACCSC's treatment of those schools stood in stark contrast to treatment of IU, which demonstrated that all of its programs were projected to meet or exceed benchmarks.

39. For example, on October 1, 2020, ACCSC placed Vista College on warning status because "**all** of the school's programs with reportable data" fell below ACCSC's student achievement benchmark rates. Ex. I at 27 (Excerpts from Arb. Ex. 3) (emphasis in original). Prior to being placed on warning status, Vista had been on outcomes reporting for five years, since May 2015. Describing the basis for moving the school to warning status, the Commission

expressed concerns that the school's program modifications submitted in March 2016 were merely "a means to 'reset' the reporting of student achievement data." *Id.* at 28.  The Commission also noted that the school's "main plan" for resolving these issues appeared to be the continuation of its prior efforts to "revise and re-launch programs," which "did not appear to resolve the school's student achievement issues." *Id.*  Placing an institution on warning status, while serious, falls well short of a full withdrawal of accreditation—an effective death sentence for a college or university.

40. Similarly, Takoda Institute remained accredited at the time of CEHE's withdrawal even though, as of July 2019, all of its programs failed to meet both graduation and employment benchmarks. *Id.* at 34. Moreover, the school had reported below-benchmark graduation and/or employment rates for all of its programs since 2014. *Id.*  The Commission's most recent evaluation of the school as of CEHE's withdrawal date noted that most of the programs were not only failing to show improvement but were actually declining. *Id.* Nonetheless, Takoda remained accredited because the Commission allowed it further time to develop student achievement support strategies and to demonstrate the effectiveness of its strategies. *Id.* at 35.

41. CEHE, on the other hand, demonstrated that its strategies were effective and that then-currently enrolled students would graduate from programs that met or exceeded graduation and employment benchmarks. Still, ACCSC withdrew IU's accreditation. ACCSC's actions did not demonstrate fair and consistent application of the *Standards*.

42. Moreover, Takoda offered diploma programs between only four and nine months in length. *Id.* at 34. In those programs, successful initiatives should have materialized in above-benchmark rates within two years—much sooner than for a school with significantly longer degree programs such as those offered by IU.  As discussed above, new cohorts in IU's degree

programs would not have been able to report for 30 to 54 months.  The Commission's willingness to continue accrediting these short programs for years without any indication of improvement stood in stark contrast to its decision to cut short IU's demonstrated progress.

43. Further underscoring ACCSC's disparate treatment of CEHE, around the time of the withdrawal, ACCSC announced that it would offer relief from strict enforcement of student achievement *Standards* in the wake of the COVID-19 pandemic.[4]  ACCSC noted that its *Standards* "contemplate [the] very notion" that COVID-19 is an "external or mitigating factor[]" that would be taken into consideration in assessing an institution's compliance with achievement *Standards*.  But where ACCSC offered relief to other institutions, it offered none to CEHE. In fact, ACCSC abruptly cut short CEHE's demonstrably successful efforts right in the middle of the pandemic.

44. The limited available evidence demonstrated that ACCSC held IU to a materially different and unreasonably higher standard than other member institutions. And that evidence likely represented just a small sampling of other schools that remained accredited notwithstanding systemic achievement rate issues. CEHE found the above-discussed accreditation decisions on ACCSC's website, which only posts its most recent decisions. In its 20 years of accreditation with ACCSC, CEHE is unaware of any instance where ACCSC withdrew accreditation from an institution that demonstrated all programs were on track to report benchmark achievement rates.

45. Indeed, the decision came as a shock to CEHE because its most recent reporting to ACCSC demonstrated that the recent roll out of its student achievement solutions had proven to be successful. In July 2020, ACCSC concluded that the new initiatives showed promise and

---

[4] The announcement can be found on ACCSC's website at:
https://www.accsc.org/UploadedDocuments/1956/COVID-19-QandA.pdf (Pg. 20 of 22).

asked to see continued evidence of improvement.  Ex. E at 15, 31. CEHE did exactly that in December 2020, but ACCSC nonetheless quickly acted to withdraw accreditation.

46. The only thing that had changed in the interim was that on August 21, 2020, a Colorado state court judge found that the use of Bureau of Labor Statistics ("BLS") salary and job outlook information advertisements for another of CEHE's institutions, CollegeAmerica, violated state consumer protection laws.[5] That decision was reversed by the Colorado Court of Appeals on August 26, 2021.

47. But before the reversal, the Colorado decision was an embarrassment to ACCSC because ACCSC had contemporaneously reviewed and approved the very same advertising practices at issue in that case. In some instances, the Commission actually commended CEHE for the practices found to be problematic by the Colorado court. But instead of publicly defending CEHE's advertising practices (which are prevalent among institutions of higher education across the country) and criticizing the Court's erroneous decision, ACCSC sought to bolster its own image by appearing "tough" against CEHE.

48. ACCSC's perceived image problem was compounded because ACCSC's application for renewal of its federal recognition was set for consideration at the July 2021 meeting of the National Advisory Committee on Institutional Quality and Integrity ("NACIQI"), which is the Department body primarily responsible for advising the Secretary on matters concerning accreditation. The impending NACIQI meeting was especially significant because the Department was in the process of withdrawing its recognition of the Accreditation Council for Independent Colleges and Schools ("ACICS"), based on its allegedly lax oversight over proprietary institutions. *See* Statement from the U.S. Department of Education on the Status of

---

[5] That case, brought in the District Court for the City and County of Denver, was captioned *State of Colorado, et. al v. Center for Excellence in Higher Education, et al.*, Case No. 14CV34530.

Recognition of Nine Accrediting Agencies and Withdrawal of Recognition of ACICS, available

at: https://www.ed.gov/news/press-releases/statement-us-department-education-status-

recognition-nine-accrediting-agencies-and-withdrawal-recognition-accrediting-council-

independent-colleges-and-schools.

49. In a transparent attempt to deflect criticism in light of the upcoming NACIQI meeting,

ACCSC sent a letter to CEHE, dated October 26, 2020, claiming that the Colorado court's

findings implicated failures to follow the *Standards* and unethical conduct. Ex. J (Arb. Ex. 8).

CEHE's January 22, 2021 response addressed each of ACCSC's concerns and included

documentation of each instance where it informed ACCSC of the advertising and recruitment

practices at issue and each instance where ACCSC accepted (and often commended) CEHE for

those same practices. *See, generally,* Ex. K (Excerpt from Arb. Ex. 7). Unable to use the

Colorado decision as a basis to withdraw IU's accreditation, ACCSC apparently dropped the

matter.

50. Against this backdrop, ACCSC's disparate treatment of CEHE demonstrates that

ACCSC's goal was defense and self-preservation at the expense of the due process and

fundamental fairness requirements to which CEHE is entitled.

> ### iv.  *Dr. McComis deliberately shielded the Appeals Panel from evidence of disparate treatment.*

51. Notwithstanding ACCSC's evident disparate treatment, CEHE has never had the

opportunity to meaningfully investigate or present evidence to that point. Immediately following

the announcement of the withdrawal decision, CEHE notified ACCSC of its intent to appeal the

decision pursuant to section VIII.C.1 of the *Rules*. Ex B at 11. Shortly thereafter, CEHE sent an

April 30, 2021 letter to Dr. McComis, noting that the publicly available decisions indicated IU

was not treated fairly under the *Standards*. Ex. L. To ensure an opportunity to defend itself

before the ACCSC appeals panel, CEHE requested records of ACCSC's treatment of other member institutions that failed to report benchmark rates. *Id.* CEHE also requested communications and records related to decisions to grant leniency to any such institutions in light of the COVID-19 pandemic. *Id.* Finally, IU sought records and communications pertaining to decisions to grant leniency to institutions that failed to meet benchmarks while transitioning from ground programs to online programs. *Id.* To alleviate any confidentiality concerns, CEHE offered that all records could be redacted to protect the identity of the implicated institutions. *Id.*

52. ACCSC's *Rules* specify that the Appeals Panel must overturn any decision that is arbitrary and capricious. *Rules*, VIII(B)(1) (Ex. B at 11). CEHE sought to prove that the withdrawal decision was arbitrary and capricious because, among other things, ACCSC failed to consistently apply its *Standards* in furtherance of its own wish to deflect scrutiny into its own oversight capabilities. The requested records were essential for that purpose.

53. But Dr. McComis made sure that no such evidence would get to the Appeals Panel. In his May 7, 2021 response to CEHE's letter, he summarily refused to produce any records of disparate treatment. Ex. I at 24. Even though federal law plainly requires ACCSC to employ effective controls against inconsistent application of the *Standards* (34 CFR 668.18(b)), Dr. McComis conceded in his response that ACCSC did not take any such measures with respect to CEHE. Shockingly, he explained that ACCSC treatment of other schools was not part of its consideration in withdrawing IU's accreditation. Ex. I at 24. That failure, in and of itself, demonstrates that the Decision was arbitrary, capricious, and in substantial disregard of the criteria for fair and impartial treatment and procedures of the Commission.

54. Dr. McComis also claimed that such records were "maintained as confidential." Ex. I at 24. But that is not true. All warning letters, probation orders, and withdrawal decisions are

initially posted to ACCSC's website (although only the most recent decisions are available for review). They are also routinely circulated to numerous other state, federal, and accrediting agencies. They are not confidential. And, as was made clear in its letter requesting the records, the Commission was free to redact any identifying information from the decisions. Ex. L.

55. Upon information and belief, Dr. McComis manipulated ACCSC's rules and processes to prevent CEHE from obtaining documents that would demonstrate ACCSC's bad faith and disparate treatment of CEHE. The decision to withhold this information continued a pattern of misuse of and disregard for ACCSC's rules to inflict harm on CEHE.

56. Years earlier, ACCSC received a series of anonymous smears, denigrating CEHE and its colleges. The smears were submitted to ACCSC in quick succession and bore similarities in format, content, and in other manners, suggestive of common authorship. Rather than specific allegations about actual events, practices, or people, these anonymous smears were filled with insults such as "scummy," "corrupt," "rip-off."

57. Precisely to prevent such harassment and abuse of the accreditation process, ACCSC's *Rules* preclude consideration of anonymous complaints. The Rules state that complaints *must* contain all relevant names, dates, and a release from the complainant, authorizing ACCSC to forward the complaint to the school. Despite this, and the appearance of coordination, ACCSC ordered CEHE to file oppressive responses, initiated its own investigation, and even sent the anonymous smears to certain state attorneys general before CEHE had the opportunity to respond. Ultimately, ACCSC closed each anonymous complaint without any findings or adverse action, but not before forcing CEHE to produce numerous responses totaling thousands of pages of supporting documents and narrative responses.

> v.   Denied crucial evidence, the Appeals Panel and Arbitrator rubberstamped
>        ACCSC's withdrawal decision.

58. Because, by Dr. McComis's own admission, consistent treatment of member institutions is not a factor ACCSC considers when taking adverse accreditation actions (Ex. I at 24), the appeals process is the only mechanism through which ACCSC has implemented any control against inconsistent application of the *Standards*. However, Dr. McComis unilaterally blocked the Appeals Panel from considering this evidence.

59. In upholding ACCSC's withdrawal decision, the Appeals Panel concluded that accreditation decisions are made on a case-by-case basis, and ACCSC's so-called "keen sense of the consistency of its decision" was a sufficient control against disproportionate treatment. Ex. M at 7 (Arb. Ex. 1, IU Appeal Decision Letter). Attributing to ACCSC a "keen sense," without any evidentiary support, does not pass muster under the substantial evidence or arbitrary and capricious standards. *W. Va. Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x 214, 228 (4th Cir. 2019) (finding that a decision is not based on substantial evidence, and is therefore arbitrary and capricious, where "the record lacks such relevant evidence as a reasonable mind might accept as adequate to support the agency's conclusion.") (internal quotations omitted).

60. CEHE then initiated arbitration as required by the *Instructions* and ACCSC Bylaws, Section I.A. Ex. C at 1. As contemplated by the *Instructions*, ACCSC designated the Arbitration Exhibits, which consisted solely of the records before the Appeals Panel when it made its decision, the hearing transcript from the hearing before the Appeals Panel, and the Appeals Panel's final decision. Pursuant to the *Instructions*, these were the only materials the arbitrator was permitted to consider. *Instructions*, Section I.F. Ex. C at 3.

61. But, as discussed above, CEHE disputed the completeness of the record, and filed a Motion to Supplement the Arbitration Exhibits.  *See* ¶ 26, *supra*. CEHE argued that, under

federal law, it was entitled to seek review of the due process it received in the ACCSC proceedings below. Ex. D at 2-3. Accordingly, CEHE sought an order from the arbitrator requiring ACCSC to supplement the Arbitration Exhibits with the same documents requested from Dr. McComis on April 30, 2022 so that CEHE could reasonably challenge whether ACCSC fairly and consistently applied its *Standards*. *Id.* CEHE also sought limited discovery to investigate ACCSC's bad faith. *Id.* at 3.

62. The arbitrator found that he was bound by the *Instructions*, which categorically precluded any discovery or consideration of any information that was not before the Appeals Panel. *Id.* at 7-8. Because Dr. McComis denied the Appeals Panel the documents, the arbitrator found that he could not consider them either. *Id.*

63. Following a hearing, the arbitrator entered the Award in favor of ACCSC on August 4, 2022. Ex. A. With respect to CEHE's contentions of disparate treatment and failure of due process, the arbitrator concluded CEHE did not "sustain[] its burden of proving that the experience of the Commission – or that of the duly constituted appeals panel – failed to provide 'effective controls against the inconsistent application of the agency's standards.'" Ex. A at 35. That result was not surprising given ACCSC's efforts to prevent the arbitrator from consideration of any evidence to contradict that finding.

64. The arbitrator also concluded that the *Instructions* and other federal case law precluded him engaging in a disparate treatment analysis comparing CEHE's withdrawal with decisions concerning other schools. Ex. A at 34. But that eluded the relevant issue before him, which was whether federal due process requirements and binding Department regulations required **ACCSC and the Appeals Panel** to consider such evidence before taking the ultimate sanction of a full withdrawal of accreditation. *See* 34 CFR 668.18(b).

## CEHE Seeks Vacatur of the Award

65. Paragraphs 1-64 are incorporated by reference herein as if set forth in full.

66. A court may vacate an arbitration award where the arbitrator refused to hear evidence pertinent and material to the controversy or where the arbitrator exceeded its powers. 9 USC 10 (a)(3) and (a)(4).

67. In this case, ACCSC's disparate treatment of CEHE with respect to the withdrawal decision was a central issue in the arbitration. But the arbitrator nonetheless refused to hear pertinent and material evidence demonstrating that ACCSC's decision to withdraw IU's accreditation was out of line with ACCSC's decisions to take far lesser sanctions with respect to similarly situated schools.

68. Federal law requires ACCSC to treat all member schools consistently in applying the *Standards*. 34 C.F.R. § 602.18(b); *see also Med. Inst. of Minn. v. Nat'l Assoc. of Trade & Tech. Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987) (stating that common law due process requires that accreditors treat similarly situated schools similarly). And CEHE is entitled to meaningful judicial review over ACCSC's adherence to that requirement. *Prof'l Massage*, 781 F.3d at 169.

69. The HEA required CEHE to initially submit to arbitration for review of the propriety of ACCSC's withdrawal decision. 20 USC 1099b(e). However, ACCSC's binding *Instructions for Arbitration* impermissibly precluded the arbitrator from considering any issue other than whether the Appeals Panel's decision was supported by the evidence in the record when the Appeals Panel rendered its decision.

70. Thus, CEHE was denied an opportunity to be heard on the issues of disparate treatment and agency bad faith. CEHE presented compelling, but limited, evidence that other member institutions were permitted to remain accredited notwithstanding similar, or worse, histories of

noncompliance with student achievement *Standards*.  While that limited evidence was apparently insufficient to sustain a finding of improper disparate treatment, it was sufficient to require ACCSC to produce evidence of its treatment of other institutions with below-benchmark student achievement rates.

71. Arbitrators must "give each of the parties to the dispute an adequate opportunity to present its evidence and argument," *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2nd Cir. 1997) (citations omitted).  Arbitral misconduct has occurred, and vacatur is therefore warranted under 9 USC 10(a)(3), where, as here, a party's right to be heard has been "grossly and totally blocked."  *Buhannic v. TradingScreen, Inc.*, 2018 U.S. Dist. LEXIS 126477, at *14-15 (S.D.N.Y. July 27, 2018) (citations omitted).

72. CEHE was also denied an opportunity to investigate and present evidence of ACCSC's true motives for the withdrawal decision. Prior to the entry of the later-reversed Colorado state court decision, ACCSC's record statements indicated that it acknowledged and commended CEHE's efforts to return all IU programs to compliance with student achievement *Standards*. But after the Colorado decision—which implicitly criticized ACCSC's own oversight of CEHE's marketing and enrollment practices—ACCSC suddenly and without explanation withdrew CEHE's accreditation, even though CEHE's most recent data demonstrated that current students were progressing through their programs at benchmark rates. Against the backdrop of the Department's recent actions to revoke federal recognition from other accreditors, ACCSC's decision appeared to represent a pretextual attempt at self-preservation, rather than a fair application of the *Standards*.

73. Under such circumstances, limited discovery was necessary to investigate the Commission's true motives for withdrawing IU's accreditation. *See Sokaogon Chippewa Cmty.*

*v. Babbitt*, 961 F. Supp. 1276, 1283-84 (W.D. Wis. 1997) (finding that an agency's sudden change in position at the time it was facing political pressure was sufficient evidence of impropriety to warrant discovery). However, the arbitrator determined that he was bound by the *Instructions*, which categorically precluded any discovery into ACCSC's motives.

## Other Causes of Action

### Count I - Violation of Due Process

74. Paragraphs 1-73 are incorporated by reference herein as if set forth in full.

75. Accreditors are required to afford due process to member institutions under federal common law. *Prof'l Massage.*, 781 F.3d at 170-71.

76. Principles of administrative law inform the federal common law duty of due process. *Id.* at 169.

77. The amount and degree of due process required by an accreditor is determined by the importance of the action being considered.  An accreditor's decision to withdraw accreditation severs eligibility to participate in federal funding programs, which are the life blood of nearly every American institution of higher education. Because a withdrawal decision is an institutional death penalty, the "need for due process protection could not be stronger." *Edward Waters Coll., Inc. v. S. Ass'n of Colls. & Sch., Inc.*, 2005 U.S. Dist. LEXIS 39443, at *18 (M.D. Fla. Mar. 11, 2005).

78. When ACCSC withdrew CEHE's accreditation, due process required that CEHE be afforded a meaningful opportunity to challenge whether the decision was made based on a good-faith application of the Standards and was consistent with ACCSC's treatment of similarly situated schools.

79. ACCSC's appeals procedures and *Instructions for Arbitration* do not afford sufficient due process because they fail to provide an institution a reasonable opportunity to acquire and present evidence of bad faith and disparate treatment.

80. ACCSC's decision to withdraw IU's accreditation and the other acts described above violated CEHE's due process rights in at least the following ways:

   a.  ACCSC's initial withdrawal decision and subsequent Appeal Panel decision were arbitrary, capricious, and not supported by substantial evidence.

   b.  ACCSC withdrew IU's accreditation without providing a meaningful opportunity to be heard.

   c.  ACCSC's decision to withdraw IU's accreditation was inconsistent with ACCSC's treatment of other member institutions, who remained accredited notwithstanding similar or worse histories of noncompliance with student achievement *Standards*.

   d.  ACCSC's acted in bad faith by withdrawing IU's accreditation as pretext to avoid federal scrutiny into its own oversight capabilities.

   e.  ACCSC failed to follow federal requirements to maintain effective controls against the inconsistent application of the *Standards*.

   f.  ACCSC appeals procedures and *Instructions for Arbitration* prevented CEHE from presenting material evidence of bad faith and inconsistent treatment.

   g.  ACCSC failed to provide a reasoned explanation for its sudden revocation of its finding that CEHE demonstrated good cause to continue its efforts to return IU's programs to compliance with student achievement *Standards*.

81. CEHE suffered damages, in an amount to be proved at trial, as a result of ACCSC's denial of due process, including lost profits, loss of business value, and loss of goodwill.

Count II – Declaratory Judgment

82. Paragraphs 1-81 are incorporated by reference herein as if set forth in full.

83. An actual and justiciable controversy exists between the parties regarding ACCSC's failure to provide due process to CEHE.

84. A judgment declaring that ACCSC's acts violated CEHE's due process rights will serve a useful purpose in clarifying and settling the legal relations at issue and will afford relief from uncertainty, insecurity, and controversy giving rise to the proceedings.

Count III – Tortious Interference With Contract (Program Participation Agreement)

85. Paragraphs 1-84 are incorporated by reference herein as if set forth in full.

86. By granting accreditation to an educational institution, ACCSC enables that institution to enter a contract with the Department of Education regarding the institution's eligibility for programs authorized by Title IV of the HEA ("Title IV programs"), known as a Program Participation Agreement ("PPA").

87. The PPA sets forth the reciprocal rights and responsibilities of the institution and the Department.

88. ACCSC had actual knowledge that IU was eligible for Title IV programs, and, consequently, knew of IU's PPA with the Department.

89. The vast majority of the students who were enrolled at IU relied on Title IV student assistance funds to pay for their educations and living expenses.

90. ACCSC knew that IU's ability to participate in Title IV programs was contingent on its continued accreditation.

91. In fact, the Department immediately cut off CEHE's ability to access Title IV funds following ACCSC's initial April 22, 2021 withdrawal decision. Without access to critical Title IV funding, CEHE was unable to continue to fund operations and was forced to close on August 1, 2021.

92. By withdrawing IU's accreditation, ACCSC intentionally and knowingly prevented CEHE from performing under the PPA.

93. ACCSC acted through improper means by, among other things:

    a.  Withdrawing IU's accreditation arbitrarily and capriciously, and without substantial evidence;

    b.  Withdrawing IU's accreditation without providing a meaningful opportunity to be heard.

    c.  Treating CEHE disparately by, among other things, withdrawing IU's accreditation while allowing other member institutions to remain accredited, notwithstanding similar or worse histories of noncompliance with student achievement *Standards*.

    d.  Withdrawing IU's accreditation in bad faith as pretext to avoid federal scrutiny into its own oversight capabilities.

    e.  Failing to follow federal requirements to maintain effective controls against the inconsistent application of the *Standards*.

    f.  Manipulating its appeals procedures and *Instructions for Arbitration* to deliberately and unlawfully block CEHE from presenting material evidence of bad faith and inconsistent treatment.

g.   Arbitrarily and capriciously, and without substantial evidence, revoking its finding that CEHE demonstrated good cause to continue its efforts to return IU's programs to compliance with student achievement *Standards*.

94. As a direct and proximate cause of this intentional, willful, and tortious interference with a contractual relationship of which ACCSC knew, CEHE has incurred damages, including, among other things, a loss of students, a loss of Title IV funding, damage to its reputation, loss of good will, loss of future profits, and a loss of business value in an amount to be proven at trial.

<u>Count IV – Tortious Interference With Contract (Student Enrollment Agreements)</u>

95. Paragraphs 1-94 are incorporated by reference herein as if set forth in full.

96. By granting accreditation to an educational institution, ACCSC enables the institution to enter into contracts with students, providing for their enrollment in accredited programs. Those contracts are known as enrollment agreements.

97. IU entered into an enrollment agreement with each of its students. The enrollment agreement sets forth reciprocal rights and responsibilities of IU and each student, including the student's responsibility to pay tuition. Students entered into such enrollment agreements based in large part on IU's accreditation by a federally recognized accrediting agency, namely, ACCSC.

98. ACCSC had actual knowledge of IU's enrollment agreements with its students.

99. ACCSC knew that IU's ability to maintain its relationships with its students depended on its ability to remain accredited.

100. By unlawfully withdrawing IU's accreditation, ACCSC knowingly and intentionally interfered with IU's contractual relationships with its students.

101. ACCSC acted through improper means by, among other things:

   a. Withdrawing IU's accreditation arbitrarily and capriciously, and without substantial evidence;

   b. Withdrawing IU's accreditation without providing a meaningful opportunity to be heard.

   c. Treating CEHE disparately by, among other things, withdrawing IU's accreditation while allowing other member institutions to remain accredited, notwithstanding similar or worse histories of noncompliance with student achievement *Standards*.

   d. Withdrawing the IU's accreditation in bad faith as pretext to avoid federal scrutiny into its own oversight capabilities.

   e. Failing to follow federal requirements to maintain effective controls against the inconsistent application of the *Standards*.

   f. Manipulating its appeals procedures and *Instructions for Arbitration* to deliberately and unlawfully block CEHE from presenting material evidence of bad faith and inconsistent treatment.

   g. Arbitrarily and capriciously, and without substantial evidence, revoking its finding that CEHE demonstrated good cause to continue its efforts to return IU's programs to compliance with student achievement *Standards*.

102. As a direct and proximate cause of this intentional, willful, and tortious interference with contractual relationships of which ACCSC knew, CEHE has incurred damages, including, among other things, a loss of students with their concomitant tuition payments, damage to its

reputation, loss of good will, loss of future profits, and a loss of business value in an amount to be proven at trial.

<u>Count V – Tortious Interference With Prospective Business or Economic Advantage</u>

103. Paragraphs 1-102 are incorporated by reference herein as if set forth in full.

104. IU entered into enrollment agreements with its students, setting forth the reciprocal rights and responsibilities of the parties, including the students' responsibility to pay tuition.

105. ACCSC knew that IU entered into such contracts with its students.

106. ACCSC's intentional and unlawful termination of IU's accreditation without due process has caused its students to withdraw. Absent ACCSC's unlawful withdrawal decision, IU's students would have continued to perform under their enrollment contracts, including the payment of tuition.

107. ACCSC also knew that IU would have continued to attract new students, who would also enter enrollment contracts with IU and pay tuition under those agreements. ACCSC's intentional and unlawful withdrawal of IU's accreditation caused future students not to enroll.

108. ACCSC acted through improper means by, among other things:

    a.  Withdrawing IU's accreditation arbitrarily and capriciously, and without substantial evidence;

    b.  Withdrawing IU's accreditation without providing a meaningful opportunity to be heard.

    c.  Treating CEHE disparately by, among other things, withdrawing IU's accreditation while allowing other member institutions to remain accredited, notwithstanding similar or worse histories of noncompliance with student achievement *Standards*.

d.   Withdrawing IU's accreditation in bad faith as pretext to avoid federal scrutiny into its own oversight capabilities.

e.   Failing to follow federal requirements to maintain effective controls against the inconsistent application of the *Standards*.

f.   Manipulating its appeals procedures and *Instructions for Arbitration* to deliberately and unlawfully block CEHE from presenting material evidence of bad faith and inconsistent treatment.

g.   Arbitrarily and capriciously, and without substantial evidence, revoking its finding that CEHE demonstrated good cause to continue its efforts to return IU's programs to compliance with student achievement *Standards*.

109. As a direct and proximate cause of this intentional, willful, and tortious interference with contractual relationships of which ACCSC knew, CEHE has incurred damages, including, among other things, a loss of students with their concomitant tuition payments, damage to its reputation, loss of good will, loss of future profits, and a loss of business value in an amount to be proven at trial.

**Prayer for Relief**

WHEREFORE, Petitioner CEHE respectfully requests that the Court:

(A)   Vacate the Award pursuant to 9 USC 10(a)(3) and remand the matter to the arbitrator for further proceedings;

(B)   Declare that ACCSC's initial decision to withdraw IU's accreditation and the Appeal Panel's subsequent affirmance thereof was arbitrary and capricious and otherwise violated due process;

31

(C)     Enter an injunction requiring ACCSC to rescind its withdrawal decision, to provide notice to the Department of Education and all other parties ACCSC has informed regarding the withdrawal decision, in all manners in which ACCSC provided notice of the withdrawal of accreditation, including via publication on ACCSC's website;

(D)     Enter an injunction requiring ACCSC to adhere to due process in all future accreditation proceedings with respect to CEHE or any of its institutions;

(E)     Award CEHE damages, in an amount to be proven at trial, for ACCSC's violation of CEHE's due process rights and tortious interference with CEHE's contracts and prospective business and economic advantages;

(F)     Award pre- and post- judgement interest, attorney's fees, and such other and further relief as this Court may deem just and proper.

## Demand for Trial by Jury

CEHE hereby demands a trial by jury on all issues so triable.

Date:   October 28, 2022                    /s/ Steven M. Gombos
                                            Steven M. Gombos, VSB No. 30788
                                            David A. Obuchowicz, VSB No. 82483
                                            Gombos Leyton, P.C.
                                            11350 Random Hills Road, Suite 400
                                            Fairfax, VA 22030
                                            Ph: (703) 934-2660/9840 (fax)
                                            Email:  dobuchowicz@glpclaw.com

                                            *Counsel for Plaintiff CEHE.*